141 F.3d 1181
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
United States of America, Plaintiff-Appellee,
v.
Hung Quoc LY, Defendant-Appellant.
United States of America, Plaintiff-Appellee,
v.
Chung WONG, Defendant-Appellant.
United States of America, Plaintiff-Appellee,
v.
Chi Pang LEE, Defendant-Appellant.
United States of America, Plaintiff-Appellee,
v.
Cindy Ruirong WAN, Defendant-Appellant.
United States of America, Plaintiff-Appellee,
v.
Chun LOK, Defendant-Appellant.
 No. 97-10130, 97-10132, 97-10148, 97-10162, 97-10166.
D.C. No. CR-96-00085-LDG.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Feb. 9, 1998.
Decided Mar. 25, 1998.
 
 On Appeal from the United States District Court for the District of Nevada Lloyd D. George, District Judge, Presiding.
 Before SCHROEDER, FARRIS, and TASHIMA, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 On conflicting evidence, the jury returned a verdict finding all five codefendants guilty of: (1) conspiracy; (2) interstate travel for purposes of racketeering; (3) money laundering; and (4) aiding and abetting. The court entered judgment on the verdict. Sentencing followed.
 
 
 3
 The defendants appeal their convictions. Hung Ly also appeals the duration of his sentence and the amount of restitution assessed against him.
 
 I. BACKGROUND
 
 4
 The alleged conspiracy took place at three casinos in Las Vegas, the Desert Inn, the MGM, and the Hilton. The defendants were charged with conspiring with a dealer at each casino to execute a "false shuffle" at a mini-baccarat table. Once the false shuffle was completed, the defendants were able to predict the outcome of approximately 7-10 upcoming hands and bet accordingly. The government contends that the defendants used this process to cheat the casinos out of a total of approximately $768,000.00.
 
 
 5
 The jury was presented with testimony and casino security videos on each of the three alleged false shuffles. Generally, the videos showed a repeated course of conduct at each casino. Approximately two defendants would sit at a table while one recorded cards. When the shoe ran out, the defendant dealer would fail to shuffle a large number of cards, thereby creating what is referred to as a "slug." Other defendants would then occupy all of the seats at the table for the next deal. They would bet sporadically and for small sums until the slug of unshuffled cards appeared. At this point, the size of the bets would increase dramatically as all the gamblers played the winning side. When the slug ran out, the defendants would leave and cash out their chips.
 
 
 6
 The defendants were alleged to have played the following roles: (1) Chun Lok-gambler at all three casinos; (2) Hung Ly-dealer at the Hilton; (3) Cindy Wan-dealer at the MGM; (4) Chung Wong-gambler at the Desert Inn only; and (5) Chi Lee-gambler at the MGM.
 
 II. DISCUSSION
 A. MONEY LAUNDERING INSTRUCTIONS
 
 7
 We examine first the instructions to the jury. Ly and Wong contend that the use of a general instruction on "knowledge" rendered the specific instruction on money laundering erroneous. The Ninth Circuit model instruction provides:
 
 
 8
 An act is done knowingly if the defendant is aware of the act and does not act through ignorance, mistake, or accident. The Government is not required to prove that a defendant knew that his acts or omissions were unlawful ....
 
 
 9
 Ninth Cir.Crim. Jury Instr. 5.06 (1995).
 
 
 10
 While the general rule on knowledge applies to the act of laundering proceeds, the government must prove that a defendant knew that the proceeds at issue were obtained unlawfully. United States v. Stein, 37 F.3d 1407, 1410 (9th Cir.1994). Ly and Wong contend that the general instruction on knowledge negated one of the elements of money laundering and that Stein requires reversal.
 
 
 11
 The instructions given do not present the same danger of confusion as did the instructions in Stein. Here, the judge twice recited that a money laundering conviction requires that the defendants knew the chips were proceeds of an unlawful, or criminal, activity. In its instruction on the elements of money laundering under 18 U.S.C. § 1956, the district court told the jury that "[i]n order for a defendant to be guilty ... the government must prove ... [that] the defendant knew the property represented the proceeds of unlawful cheating from a Nevada gaming establishment or some form of unlawful activity." Similarly, in instructing on the charges under 18 U.S.C. § 1957, the court stated that the government was required to prove that "the defendant then knew that the cashing of gaming chips in exchange for currency at casinos involved the proceeds of a criminal offense."
 
 
 12
 These instructions differ from those in Stein, because the district court specifically charged the jury with finding knowledge of "unlawful activity" or "a criminal offense" as a predicate for the money laundering transaction. Moreover, the judge directed the jury to consider the defendants' knowledge of the prior offense at the time of the laundering transaction. This does not conflict with the Ninth Circuit's general instruction on knowledge, i.e., that the defendant need not know that the act he is committing is unlawful. When the specific instruction is read in conjunction with the general instruction, it is clear that there was no reasonable possibility that the jury was confused.
 
 B. EXPERT TESTIMONY OF WILLIAM ZENDER
 
 13
 Initially, all five codefendants challenge the district court's decision to allow the expert testimony of William Zender. Zender, a former dealer and manager of casino games, testified as to the rules of mini-baccarat and the defendants' actions on the security videos. Ly asserts that Zender's testimony was improperly admitted without being subjected to analysis under Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Wan contends that Zender was not qualified as an expert even without Daubert analysis. All defendants challenge the scope of the testimony permitted.
 
 
 14
 The applicability of Daubert is reviewed de novo. McKendall v. Crown Control Corp., 122 F.3d 803, 805 (9th Cir.1997). A district court's evidentiary rulings and admission of expert testimony are reviewed for abuse of discretion. United States v. Morales, 108 F.3d 1031, 1035 (9th Cir.1997). The district court abuses its discretion when it bases its decision on an erroneous view of the law or a clearly erroneous assessment of the facts. Id .
 
 
 15
 When ruling on the admission of expert testimony, the district court has broad discretion in determining the witness' expert qualifications. McKendall, 122 F.3d at 806. The court must next decide whether the subject of the testimony properly concerns "scientific, technical, or other specialized knowledge" under Rule 702. Id. (citations omitted). Finally, the court determines whether the testimony will help the jury, i.e., whether it is reliable and relevant. Id.
 
 
 16
 Under Daubert, there are several factors used to determine whether "scientific" evidence will help a jury. These include (1) whether the theory or technique can be tested; (2) whether a theory has been subjected to peer review; (3) whether there is a high known or potential rate of error; and (4) whether a theory has acceptance in the scientific community. Daubert, 509 U.S. at 593-94.
 
 
 17
 Ly argues that a district court must apply the four specialized Daubert factors to all expert testimony. In the alternative, Ly maintains that Zender's testimony should have been deemed scientific for purposes of Daubert.
 
 
 18
 Early Ninth Circuit authority gave inconsistent statements on whether the Daubert factors apply to all expert testimony. Compare United States v. Cordoba, 104 F.3d 225, 227 (9th Cir.1997) (Daubert applies only to "scientific" testimony) with Thomas v. Newton Int'l Enterprises, 42 F.3d 1266, 1270 n. 3 (9th Cir.1994). Our more recent cases hold that Daubert applies to scientific testimony only. See United States v. Bighead, 128 F.3d 1329, 1330 (9th Cir.1997); McKendall, 122 F.3d at 806; Cordoba, 104 F.3d at 227.
 
 
 19
 The most recently enumerated holdings are sound and clarify that the Daubert factors only apply to testimony deemed "scientific." The district court did not err in determining that Zender's testimony was not scientific. Zender was relying on observations and experience, rather than mathematical probabilities as Ly asserts. Of course, the district court could not admit the testimony without considering reliability. Daubert requires this of all testimony. McKendall, 122 F.3d at 806 n. 1.
 
 
 20
 Zender had the qualifications and specialized knowledge of an expert. The record establishes that he had years of experience managing and dealing table games at various casinos, investigating cheating for the Nevada Gaming Commission, and teaching dealers at schools. Other than a possible unfamiliarity with MGM policy manuals, no defendant has suggested any shortcoming in Zender's methods and observations. We find none. The testimony was relevant to help the jury understand both mini-baccarat and the possible ramifications of otherwise innocuous looking behavior. Cf. United States v. Alonso, 48 F.3d 1536, 1541 (9th Cir.1995)(discussing the general principle that police officers may provide explanatory expert testimony). The district court did not abuse its discretion in allowing Zender to testify as an expert.
 
 
 21
 Rule 704 prohibits expert opinion on a criminal defendant's mental state when the mental state constitutes an element of the crime charged. FRE 704(b); United States v. Kinsey, 843 F.2d 383, 388 (9th Cir.1988). Opinion testimony may be given even if it "encompasses an ultimate issue to be resolved by the trier of fact unless the testimony concerns the defendant's mental state or condition." Id. We interpret FRE 704 to allow expert testimony that supports "an inference or conclusion that the defendant did or did not have the requisite mens rea, so long as the expert does not draw the ultimate inference or conclusion for the jury and the ultimate inference or conclusion does not necessarily follow from the testimony." Morales, 108 F.3d at 1038. Moreover, a witness may not give a direct opinion on a defendant's guilt or innocence. Kinsey, 843 F.2d at 388.
 
 
 22
 The defendants argue that Zender testified as to their intent to cheat under the conspiracy charge. The testimony most uniformly challenged came in response to questioning about the Desert Inn. The colloquy went as follows:
 
 
 23
 Q. After reviewing the tape and doing your i nvestigation...did you reach an opinion about the shuffle that was performed at...the Desert Inn?
 
 
 24
 A. Yes, I did.
 
 
 25
 Q. And what was your opinion?
 
 
 26
 A. Based on the shuffle that I viewed on the tape, based on the player's activities at the table, such as appearance or recording cards, the bet variations, the general play, I came to the conclusion that this is not consistent with a trained group of people taking advantage of a weak or sloppy dealer but was consistent with a group of people that were--that seemed to be fairly well trained working in connection with the dealer who was false shuffling in order to cheat casino...
 
 
 27
 The defendants also challenge Zender's opinions that recording cards were taken from gaming tables "to make sure that those aren't taken and they don't fall into management or casino's hands;" that a false shuffle was one which involved the "intentional manipulation of the cards;" and that the deals were not the result of sloppy handling.
 
 
 28
 Even if these opinions improperly invaded the province of jury, their admission was harmless. Zender could properly testify to the rules of the games, the action on the video, and styles of experienced dealers and gamblers. We further allow expert testimony from law enforcement officials to explain innocent looking conduct. Alonso, 48 F.3d at 1542-43; Kinsey, 843 at 387. This is justified on grounds that it will help the jury understand how otherwise innocent looking conduct "might in fact be consistent with or even indicative of criminal conduct" Alonso, 48 F.3d at 1542. While admission of such testimony should not be allowed routinely, it is not inherently prejudicial. Id.
 
 
 29
 Zender's testimony fits within these permissible categories. Although the government and district court relied heavily on Zender's testimony, neither expressly mentioned the portions which potentially negated the permissible innocent inferences. United States v. Lim, 984 F.2d 331, 335 (9th Cir.1993)(discussing profile testimony).
 
 
 30
 C. EXCLUSION OF EVIDENCE OF LEE'S GAMBLING ACTIVITY
 
 
 31
 Lee contends that the district court erred in excluding evidence that he often travelled to Las Vegas and lost substantial sums of money from 1994, through 1996. According to Lee, he intended to argue that it was illogical that a man who lost substantial sums on a regular basis would join a conspiracy to cheat.
 
 
 32
 Prior to trial, the district court granted the government's motion in limine to exclude evidence of Lee's prior gambling activity. From the bench, the court found that the evidence from years past was not relevant, especially under a FRE 403 balancing test. The district court determined that it would only allow evidence of gambling activity during the period of the alleged conspiracy.
 
 
 33
 The district court has wide discretion to exclude evidence under FRE 403. United States v. Layton, 767 F.2d 549, 554 (9th Cir.1985). In the context of a due process claim that the evidentiary ruling precluded the defendant's theory of defense, a court should consider "the probative value of the evidence on the central issue." Walters v. McCormick, 122 F.3d 1172, 1177 (9th Cir.1997). The defendant's interest will be weighed against the government's in conducting efficient trials under the rules of evidence. Perry v. Rushen, 713 F.2d 1447, 1450 (9th Cir.1983).
 
 
 34
 There was no abuse of discretion. Lee was able to present testimony that he sustained heavy losses and made numerous trips to Las Vegas. Further, counsel was permitted to argue this point in opening and closing. Additional evidence of losses was, at best, of marginal value to show that Lee did not intend to cheat. Had it been allowed, other extraneous matters would have become relevant, such as an alleged misuse of casino credit. The district court exercised sound discretion in determining that admission of such matters would have constituted a waste and possibly confused the jury.
 
 D. EXCLUSION OF DEFENSE EXPERT
 
 35
 Lee contends that the district court erred in excluding his expert Michael Goodman. Lee called Goodman to testify as to the betting patterns of Asian gamblers. The district court excluded the testimony on grounds that Goodman did not qualify as an expert, that the testimony was irrelevant, and that the testimony would not be helpful to the jury.
 
 
 36
 The district court did not abuse its discretion. The record reflects that Goodman's qualifications rested largely, if not solely, on having observed ten-to-fifteen Asian gamblers playing Pai Gao Poker in California. Further, Goodman's testimony on these experiences would have opened the door to government evidence from Goodman's own articles that the Asian gamblers he observed would often cheat. Such race-based evidence was properly excluded.
 
 E. SUFFICIENCY OF THE EVIDENCE
 
 37
 In reviewing challenges to the sufficiency of the evidence, we determine "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Bautista-Avila, 6 F.3d 1360, 1362 (9th Cir.1993).
 
 
 38
 Wong argues that the money laundering convictions under § 1956(a)(1) must be reversed as a matter of law. Wong contends that the chips won during the games were not "monetary instruments" and, as such, the cashing of the chips could not constitute laundering. Wong bases his argument on Nevada law which establishes that gambling chips are mere evidence of debt owed by the casino and cannot be used for purposes other than gambling.
 
 
 39
 Wong misreads the statute. There is no requirement that a financial transaction involve a "monetary instrument" to fall within § 1956(a)(1)(A). Instead, this portion of the statute requires a financial transaction involving the "proceeds" of illegal activity. 28 U.S.C. § 1956(a)(1). We define "proceeds" broadly to include such things as a fraudulently obtained line of credit. United States v. Estacio, 64 F.3d 477, 480 (9th Cir.1995). Similarly, chips gained from an unlawful cheat are proceeds as evidence of debt owed by the casino to the holder. United States v. Manarite, 44 F.3d 1407, 1416-17 (9th Cir.1995).
 
 
 40
 Nor can it be said, as Lok asserts, that the defendants did not complete the cheat until the cashing of the chips. We recognize that cashing the chips helped the defendants realize monetary benefit from the cheats. Id. at 1416. This obvious fact does not lead to Lok's suggestion that the chips were of no value until cashed. Instead, it is evidence that the cashing helped "promote" the unlawful activity. 18 U.S.C. § 1956(a)(1)(A); Manarite, 44 F.3d at 1416. We reject Lok's additional contentions that the evidence did not show a violation of Nevada law or that he knew that the cheat was illegal.
 
 
 41
 The record supports the convictions for a single conspiracy and violations of the Travel Act. The evidence was sufficient to establish international travel to Las Vegas to conduct three complex and virtually identical cheats over a brief period of time. In addition, the commonality of the participants and the magnitude of the overall scheme could satisfy a trier of fact of a conspiracy to commit Travel Act or money laundering violations. United States v. Bibbero, 749 F.2d 581, 587 (9th Cir.1984)(discussing the law of multiple conspiracies); United States v. Tavelman, 650 F.2d 1133, 1140 (9th Cir.1981)(discussing the Travel Act). The district court did not err in refusing to grant a new trial or acquittal on the grounds of insufficient evidence.
 
 X. SENTENCING ISSUES: HUNG LY
 
 42
 Ly claims that the district court erred by (1) holding him responsible for the conduct at all three casinos; (2) enhancing his sentence two levels for the use of a special skill; and (3) assessing restitution against him in the full amount of the loss at all three casinos.
 
 A. AMOUNT OF LOSS ATTRIBUTABLE TO LY
 
 43
 Ly only dealt cards at the Hilton. The district court computed Ly's sentence based on the amount of loss at all three casinos. Ly failed to object at sentencing. We review for plain error. United States v. Valencia, 15 F.3d 149, 151 (9th Cir.1994).
 
 
 44
 Section 1B1.3(a)(1)(B) requires the sentencing court to take into account "all reasonably foreseeable acts...in furtherance of the jointly undertaken activity." U.S.S.G. § 1B1.3(a)(1)(B). The amount of loss attributable to Ly is not necessarily established by merely looking to the amount of loss in the conspiracy as a whole. United States v. Castaneda, 9 F.3d 761, 769-70 (9th Cir.1993). Instead, the sentencing court can properly look to the amount of loss which Ly reasonably foresaw or which fell within the scope of his particular agreement. Id.
 
 
 45
 The evidence ties Ly to the four players from Hong Kong as well as to the dealer who conducted the false shuffle at the Desert Inn. As with the assignment of error on multiple conspiracies, the similarity of the participants bolsters the finding of foreseeability. The temporal proximity of the three cheats is also indicative of foreseeability. It was not plain error to adopt the presentence report's recommendation that the activity at all three casinos was foreseeable. Valencia, 15 F.3d at 152.
 
 
 46
 B. TWO LEVEL ENHANCEMENT FOR USE OF SPECIAL SKILL
 
 
 47
 The district court enhanced Ly's sentence by two levels under U.S .S.G. 3B1.3. Under the guideline, a two level enhancement is allowed if the defendant "used of a special skill in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3
 
 
 48
 We interpret enhancement to require a "preexisting, legitimate skill not possessed by the general public." Id. (citation omitted). The guideline defines "special skill" as one not possessed by the general public and "usually requiring substantial education, training, or licensing." U.S.S.G. § 3B1.3 comment. (applic. note 2). Examples include pilots, lawyers, doctors, accountants, chemists, and demolition experts. U.S.S.G. § 3B1.3 comment. (applic. note 2).
 
 
 49
 The government argues that the enhancement was proper since dealers "typically" go to casino schools prior to dealing. The government claims that dealers work anywhere from a few months to two years prior to dealing at a casino such as the Hilton. It also notes that Ly would have needed to train to execute a false shuffle.
 
 
 50
 Even if we accept the government's argument, the district court failed to make any special skill findings specific to Ly. It held that the enhancement applied, since Ly used his skill as a dealer, but enhancement requires more than a finding that the skill is one used in the defendant's job. Id. at 507 n. 5 (stating that "[c]ourts should be particularly cautious in imposing special skills adjustments where substantial education, training, or licensing is not involved.")
 
 
 51
 We do not resolve the question of what may satisfy the requirement of "special skill." We are not prepared to make a factual determination and the record is insufficient for us to form a legal conclusion. We therefore reverse the holding of special skill and remand for re-sentencing. This will permit the court to supplement or reject the request for special skills enhancement.
 
 C. AMOUNT OF RESTITUTION
 
 52
 The district court adopted a recommendation from the presentence report holding Ly jointly and severally liable for the full $768,120 loss at all three casinos. Ly argues that he should not be responsible for the sums at the MGM and the Desert Inn.
 
 
 53
 We review the "legality of a restitution order de novo." United States v. Dayea, 73 F.3d 229, 230 (9th Cir.1995). Restitution may only be awarded as authorized by the Victim Witness Protection Act, 18 U.S.C. § 3663. Under the statute, a court can properly order restitution in conspiracy cases for losses "resulting from any conduct that was part of the conspiracy and not just from the specific conduct that met the overt act requirement..." United States v. Reed, 80 F.3d 1419, 1423 (9th Cir.1996). The question is whether an individual defendant may be held liable for the full amount of losses or only for an amount attributable to his own conduct in furtherance of the conspiracy.
 
 
 54
 Based on a premise that a defendant is legally liable for all of his coconspirators' actions, numerous courts have upheld imposition of joint and several liability. United States v. Chaney, 964 F.2d 437, 453 (5th Cir.1991); United States v. Harris, 7 F.3d 1537, 1539 (10th Cir.1993); United States v. Ismoila, 100 F.3d 380, 398 (5th Cir.1996). Without detailed comment, we have also allowed imposition of joint and several liability. United States v.. Angelica, 951 F.2d 1007, 1009-10 (9th Cir.1991).
 
 
 55
 Ly was convicted of conspiracy. The underlying conduct supporting the conviction included scams at all three casinos. There is no requirement that the restitution against Ly be limited to the losses directly caused by his own conduct in furtherance of the conspiracy. We find no error.
 
 XI. CONCLUSION
 
 56
 We affirm, except for Ly's sentence enhancement for "special skill" and remand that issue for further consideration.
 
 
 57
 Affirmed, but remanded in part.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir. R. 36-3